# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JAMIE DOUGLAS GEER,

     Petitioner,

v.                            Case No. 8:21-cv-1716-KKM-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

## ORDER

Geer, a Florida prisoner, timely filed a pro se second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 43.) Also, Geer moved for an evidentiary hearing. (Doc. 74.) Having considered the second amended petition, (Doc. 43), the response in opposition, (Doc. 49), and the reply and the supplemental reply, (Docs. 56 and 57), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability is not warranted. Because the record refutes Geer's claims, the motion, (Doc. 74), for an evidentiary hearing is denied.

# I.    BACKGROUND

## A. Procedural Background

A state court jury convicted Geer of sexual battery, lewd and lascivious battery, and unlawful sexual activity with a minor. (Doc. 21-2 at 1278–80, 1282–83.) The state trial court sentenced him to life in prison for the sexual battery conviction, a concurrent fifteen years in prison for the lewd and lascivious battery conviction, and a consecutive fifteen years in prison for the unlawful sexual activity with a minor conviction. (Doc. 21-2 at 1284–87.) The state appellate court per curiam affirmed the convictions and sentences. (Doc. 21-2 at 1410.)

Geer filed numerous postconviction motions and petitions in state court, including three petitions alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d), (Docs. 21-2 at 1415–30, 1473–87 & 21-3 at 321–91), two petitions for a writ of habeas corpus seeking relief for a manifest injustice, (Docs. 21-2 at 1496–1544 & 21-3 at 627–33), two motions for postconviction relief under Florida Rule of Criminal Procedure 3.850, (Docs. 21-2 at 1631–78 & 21-3 at 768–818), a postconviction motion to suppress, (Doc. 21-3 at 399–415), and two motions to correct his sentence under Florida Rule of Criminal Procedure 3.800(a). (Doc. 21-3 at 597–600, 913–22.) The state court denied relief.

2

(Docs. 21-2 at 1463, 1489, 1546, 1716–30, 1838–64, 2249–63 & 21-3 at 315, 393, 417–19, 589, 602–03, 635, 826–33, 909, 932–33.)

## B. Timeliness

A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Geer's convictions and sentences were affirmed on appeal on February 12, 2014. (Doc. 21-2 at 1410.) His judgment became final 90 days later, on May 13, 2014, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002).

The limitation ran for 117 days until September 8, 2014, when Geer filed a petition alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d). (Doc. 21-2 at 1415–30.) The state appellate court denied the petition, (Doc. 21-2 at 1463), and the limitation tolled until January 7, 2015, when Geer's motion for rehearing was denied. (Doc. 21-2 at 1465.)[1]

---

[1] Geer sought further review in the Supreme Court of the United States. (Doc. 21-2 at 1467, 1469.) However, the limitation does not toll while postconviction proceedings are

3

On November 12, 2014, before the limitation resumed, Geer filed a second petition alleging ineffective assistance of appellate counsel. (Doc. 21-2 at 1473–87.) The state appellate court denied the petition, (Doc. 21-2 at 1489), and the limitation tolled until February 18, 2015, when Geer's motion for rehearing was denied. (Doc. 21-2 at 1491.)

The limitation ran for 18 days until March 9, 2015, when Geer filed a petition for a writ of habeas corpus seeking relief for a manifest injustice. (Doc. 21-2 at 1496–1519.) The state appellate court denied the petition without prejudice for Geer to seek relief under Florida Rule of Criminal Procedure 3.850. (Doc. 21-2 at 1546.) Because in state court a defendant properly seeks relief for a manifest injustice by filing a habeas petition, the limitation tolled until May 19, 2015, when Geer's motion for rehearing was denied. (Doc. 21-2 at 1548.) *Johnson v. State*, 226 So. 3d 908, 910 (Fla. 4th DCA 2017).[2]

---

pending in the Supreme Court of the United States. *Lawrence v. Florida*, 549 U.S. 327, 329 (2007).

[2] Geer sought further review in the Supreme Court of Florida and the Supreme Court of the United States. (Doc. 21-2 at 1550, 1556, 1558.) Because the Supreme Court of Florida lacked jurisdiction to review the state appellate court's decision without a written opinion, (Doc. 21-2 at 1550), the proceedings did not toll the limitation. *Artuz v. Bennett*, 531 U.S. 4, 9 (2000). Also, the limitation does not toll while postconviction proceedings are pending in the Supreme Court of the United States. *Lawrence*, 549 U.S. at 329.

The limitation tolled for 63 days until July 22, 2015, when Geer filed a motion for postconviction relief under Florida Rule of Criminal Procedure Rule 3.850. (Doc. 21-2 at 1560–1618.) Even though the state postconviction court struck the motion because Geer failed to comply with filing requirements, (Doc. 21-2 at 1622–23), Geer's properly filed amended motion related back to the initial motion for tolling. (Doc. 21-2 at 1631–76.) *Morris v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1351, 1354 (11th Cir. 2021). The state postconviction court denied the motion after an evidentiary hearing, (Doc. 21-2 at 2249–63), and the state appellate court affirmed. (Doc. 21-3 at 315.) The limitation tolled until November 25, 2020, when the mandate issued on appeal. (Doc. 21-3 at 317.) *Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000).

The limitation tolled for 57 days until January 22, 2021, when Geer filed a motion to correct his sentence under Florida Rule of Criminal Procedure 3.800(a). (Doc. 21-3 at 913–21.) The state postconviction court denied the motion, (Doc. 21-3 at 932–33), and Geer appealed. (Doc. 21-3 at 941–42.) The limitation tolled until June 28, 2021, when the state appellate court dismissed the appeal after Geer filed a notice of voluntary dismissal. (Doc. 21-3 at 951.)

The limitation ran for 14 days until July 13, 2021, when Geer filed a § 2254 petition. (Doc. 1.) Because 96 days remained on the one-year limitation, Geer timely filed the federal petition.

### Ground Six

Geer filed an amended federal petition and a second amended federal petition. (Docs. 21 & 43.) The initial petition, (Doc. 1), and the amended petition, (Doc. 12), contain the same claims. In the second amended petition, Geer asserted a new claim in Ground Six. (Doc. 43 at 11.) Geer asserted that the state postconviction court violated his federal rights by denying a motion to suppress. (Doc. 43 at 11.)

Because a § 2254 petition is not an "application for State postconviction or other collateral review" under § 2244(d)(2), the limitation did not toll when Geer filed his initial federal petition. *Duncan v. Walker*, 533 U.S. 167, 181–82 (2001). The limitation resumed on June 29, 2021, after Geer voluntarily dismissed his state postconviction appeal. (Doc. 21-3 at 951.) The limitation expired 96 days later, on October 4, 2021.

On March 1, 2019, before the limitation expired, Geer filed a second motion for postconviction relief. (Doc. 21-3 at 644–84.) Because the state postconviction court dismissed the second motion as untimely, (Doc. 21-3 at 829), and the state

6

appellate court per curiam affirmed, (Doc. 21-3 at 909), the second motion did not toll the limitation. *Jones v. Sec'y, Fla. Dep't Corrs.*, 906 F.3d 1339, 1351 (11th Cir. 2018). Even though the state postconviction court also addressed the merits of the motion, (Doc. 21-3 at 829–31), the limitation did not toll. *Sweet v. Sec'y, Dep't Corrs.*, 467 F.3d 1311, 1318 (11th Cir. 2006).

On March 20, 2023, after the limitation expired, Geer filed his second amended federal petition with the new claim in Ground Six. (Doc. 43 at 11.) "Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings 'ar[i]se out of the conduct, transaction, or occurrence.' " *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Fed. R. Civ. P. 15(c)(2)). "[R]elation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Mayle*, 545 U.S. at 659.

The Respondent contends that the claim in Ground Six in the second amended petition "appears to relate back" to the claim in Ground One in the initial petition. (Doc. 49 at 5–6.) However, in Ground One in the initial petition, Geer asserted that trial counsel deficiently performed by not filing a motion to suppress a recorded telephone call between Geer and the victim. (Doc. 1 at 5.) In Ground Six,

Geer asserts that the state postconviction court violated his rights under the Fourth Amendment and Title III of the Wiretap Act by denying his motion to suppress four recorded telephone calls admitted into evidence at the postconviction evidentiary hearing. (Doc. 43 at 11–12.)

The ineffective assistance of counsel claim in Ground One is based on trial counsel's conduct before and during trial. (Doc. 1 at 5.) The claim in Ground Six is based on the admission of evidence at the postconviction evidentiary hearing. (Doc. 43 at 11.) Also, the ineffective assistance of counsel claim in Ground One is based on trial counsel's failure to move to suppress one recorded telephone call. (Doc. 1 at 5.) The claim in Ground Six is based on the allegedly erroneous admission of four recorded telephone calls at the evidentiary hearing. (Doc. 43 at 11.) Because each claim is based on different conduct and arises out of a different transaction and occurrence, the claim in Ground Six does not relate back to the claim in Ground One. *Mungin v. Sec'y, Fla. Dep't Corrs.*, 89 F.4th 1308, 1322 (11th Cir. 2024) ("The Supreme Court has held that '[a]n amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the

original pleading set forth.' " (quoting *Mayle*, 545 U.S. at 650)). Consequently, Ground Six is dismissed as time barred.[3]

### C. Factual Background

At trial, the victim, who was nineteen, testified that Geer began to engage in sexual activity with her when she was seven, began to engage in oral sex with her when she was eleven, and began to engage in vaginal sex with her when she was fifteen.

When the victim was seven, Geer married the victim's mother. (Doc. 21-2 at 512–14, 779.) After the victim observed Geer engage in sex with her mother, Geer spoke to the victim about sex. (Doc. 21-2 at 514–15, 777, 881–82.) Geer showed the victim his erect penis, explained to the victim how penetration occurs, and masturbated in front of the victim. (Doc. 21-2 at 516–17.) Geer told the victim to not disclose the sexual activity to anyone. (Doc. 21-2 at 517.)

---

[3] Even if the claim in Ground Six is timely, Geer alleges that the "[f]our recorded phone calls were introduced into evidence at [his] evidentiary hearing just after the [prosecutor] determined it was illegal to do so." (Doc. 43 at 11.) In his motion to suppress filed in state court, Geer asserted that the prosecutor violated Florida, Georgia, and federal law by introducing the recordings into evidence at the postconviction evidentiary hearing. (Doc. 21-3 at 399–14.) Because "[the Eleventh Circuit] has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief," the claim in Ground Six is meritless. *Carroll v. Sec'y, Dep't Corrs.*, 574 F.3d 1354, 1365 (11th Cir. 2009).

Geer and the victim's family moved to Tennessee because Geer accepted a job as a deputy fire chief. (Doc. 21-2 at 518–19.) While in Tennessee, Geer video recorded the victim while she wore lingerie and posed in a lewd manner. Geer gave the victim small gifts after she both complied with his requests and agreed to not disclose the sexual activity to anyone. (Doc. 21-2 at 519–23.)

When the victim was eleven, Geer and the victim's family moved to Tampa Bay because Geer accepted a job as fire chief at the City of Clearwater. (Doc. 21-2 at 524, 780.) After the move, the victim's relationship with her mother deteriorated because of her mother's addiction to drugs and alcohol. (Doc. 21-2 at 525–26, 783, 786–87.) The victim, who was in sixth grade, heard a student at school use the phrase, "Blow me." The victim asked Geer what the phrase meant, and Geer engaged in oral sex with the victim, ejaculated in his hand, and told the victim to taste his semen. (Doc. 21-2 at 527–29.) Geer reminded the victim to not disclose the oral sex to anyone. (Doc. 21-2 at 529.)

Later that year, after a Christmas party, Geer came into the victim's bedroom and placed his hand up her dress and between her legs. (Doc. 21-2 at 530–32.) When the victim tried to push Geer's hand away, Geer told her that he wanted her to learn about "fingering." (Doc. 21-2 at 532.) The victim replied that she wanted to wait to

engage in sex with someone "special," but Geer continued to penetrate her vagina with his finger. (Doc. 21-2 at 532.) When the victim told Geer that she felt pain, Geer responded that she was not bleeding and continued. (Doc. 21-2 at 532–33.)

When the victim was twelve, Geer purchased the victim mobile telephones, purses, shoes, clothes, and other gifts in exchange for oral sex and masturbation. (Doc. 21-2 at 537–38, 787.) Geer told the victim that, if anyone learned about the sexual activity, Geer would deny that any sexual activity occurred to avoid losing his job as fire chief. (Doc. 21-2 at 538.) The victim traveled with Geer on trips for work conventions. (Doc. 21-2 at 539–40, 787.) During a trip to Jacksonville, Geer video recorded the victim wearing lingerie and engaging in oral sex with him. (Doc. 21-2 at 540–42.) Geer purchased two expensive purses for the victim because during a trip to Marco Island she wore lingerie and engaged in oral sex. (Doc. 21-2 at 542.)

When the victim was fifteen, she began a relationship with a male whom she met at her friend's church. (Doc. 21-2 at 548, 691.) The victim asked Geer questions about sex when the victim and her boyfriend became physically intimate. (Doc. 21-2 at 548–49.) Geer told the victim that he would penetrate her vagina with his finger and engage in vaginal sex with her because she would otherwise experience pain the first time that she engaged in vaginal sex with her boyfriend. (Doc. 21-2 at

550.) Geer attempted to engage in vaginal sex with the victim, but the victim experienced too much pain. (Doc. 21-2 at 550–51.) Geer continued to trade gifts for sexual activity, including oral sex, with the victim. (Doc. 21-2 at 549–52.)

After Geer learned that the victim engaged in vaginal sex with her boyfriend, Geer congratulated the victim but later angrily confronted her and threatened to send her to live with her grandmother in Georgia if she did not engage in sex with him, too. (Doc. 21-2 at 553–55.)[4] The victim reluctantly agreed to engage in vaginal sex with Geer because she did not want to end her relationship with her boyfriend. (Doc. 21-2 at 555.) However, the victim insisted that Geer give her gifts in exchange for vaginal sex. (Doc. 21-2 at 556, 558.)

The victim identified Geer's genitals by testifying that Geer shaved the hair around his genitals and applied excessive amounts of baby powder to his genitals. (Doc. 21-2 at 557.) Also, the victim testified that Geer had one testicle. (Doc. 21-2 at 557.) The victim's mother verified the victim's description of Geer's genitals.

---

[4] On cross-examination, the victim explained that Geer was upset because that evening the victim, who was fifteen, slept with her boyfriend in the same bed in Geer's home. (Doc. 21-2 at 695–96.)

(Doc. 21-2 at 814–15.) The victim's mother denied that she had described Geer's genitals to the victim. (Doc. 21-2 at 815.)[5]

Geer told the victim that, if she planned to tell anyone about the sexual abuse, she should tell Geer first, and he would stop. (Doc. 21-2 at 559.) Many times, the victim asked Geer to stop, and the sexual abuse stopped. (Doc. 21-2 at 559.) However, the sexual abuse resumed a short time later. (Doc. 21-2 at 559.) Once, during vaginal sex, the victim asked Geer to stop because she experienced pain, but Geer refused because he wanted to ejaculate. (Doc. 21-2 at 560.) Because Geer's actions hurt the victim's feelings, the victim told her boyfriend about the sexual abuse. (Doc. 21-2 at 560–61.) The victim's boyfriend threatened to tell the victim's mother about the sexual abuse, unless the victim told her mother. (Doc. 21-2 at 561.) The victim disclosed the sexual abuse to her mother but asked her mother not to report the sexual abuse to law enforcement. (Doc. 21-2 at 561–62, 564, 789–90.)

Geer planned to travel with the victim to another convention for work. (Doc. 21-2 at 563.) The victim refused to go with Geer because she wanted to stay with

---

[5] The parties stipulated that Geer had one testicle. (Doc. 21-2 at 1042.)

her boyfriend. (Doc. 21-2 at 563, 566, 791.) Geer became angry when the victim's

mother forbade the victim from traveling with Geer. (Doc. 21-2 at 564–65, 791.)

During a telephone call, which the victim's mother and her boyfriend overheard,

Geer told the victim that he felt angry because the victim did not want to travel with

him. (Doc. 21-2 at 565–66.) The victim apologized but explained that she felt

pressured. (Doc. 21-2 at 566–67.) Geer asked the victim if her mother "knew what

was going on." (Doc. 21-2 at 566, 792.)

When Geer returned from the trip, the victim's mother confronted Geer and

asked him why he sexually abused the victim, and Geer apologized, promised to

never sexually abuse the victim again, and explained that the victim was curious.

(Doc. 21-2 at 792–93, 860.) The victim's mother agreed to not report the sexual

abuse to law enforcement. (Doc. 21-2 at 568, 860–61.) The victim believed that

Geer would stop the sexual abuse. (Doc. 21-2 at 568.) However, when Geer

approached the victim shaking and crying and told the victim that her mother called

him a "molester," the victim started crying too. (Doc. 21-2 at 569–70.) Later that

evening, Geer apologized again and told the victim that he loved her, and the victim

engaged in oral sex with him because she felt guilty. (Doc. 21-2 at 570–71.)

14

Geer continued to engage in vaginal and oral sex with the victim. (Doc. 21-2 at 572.) The victim's mother moved out of the house, divorced Geer, and started a relationship with another male, Norm Jernigan. (Doc. 21-2 at 574, 576–77, 795–99, 865–67.) When the victim was sixteen, the victim became pregnant with her boyfriend's child. (Doc. 21-2 at 576–77.) The victim's relationship with her mother worsened because her mother wanted her to abort the pregnancy. (Doc. 21-2 at 578, 800–801.) Because Geer supported the victim's pregnancy, the victim moved back to Geer's home. (Doc. 21-2 at 578–79.) Geer continued to engage in vaginal and oral sex with the victim in exchange for prenatal vitamins, ultrasounds, rides to doctor's appointments, and medicine. (Doc. 21-2 at 579–81.)

After the victim's baby was born, the victim and the baby lived with her boyfriend and his family. (Doc. 21-2 at 583–85, 800–01.) The victim ended her relationship with her boyfriend and returned to live with her mother. (Doc. 21-2 at 585–86, 802.) During an argument, the victim told her mother that she planned to move back to Geer's home, and her mother threatened to report the sexual abuse to law enforcement if she took the baby with her. (Doc. 21-2 at 586–88.) The victim, who was sixteen, left the baby with her mother and moved back to Geer's home.

(Doc. 21-2 at 588.) Geer exchanged oral and vaginal sex with the victim for cigarettes, beer, and parties at his home. (Doc. 21-2 at 588–90.)

The victim traveled with her baby to Georgia to stay with her grandmother. (Doc. 21-2 at 592–93.) The victim returned to Florida to spend the baby's first birthday with the baby's father and his family. (Doc. 21-2 at 593, 804–05.) During the visit, the victim's mother took the victim to the mall and arranged for law enforcement agents to question the victim about the sexual abuse. (Doc. 21-2 at 597–99, 806–08.) When the victim arrived at the mall and learned about the interview, the victim became angry, denied that Geer had sexually abused her, claimed that Jernigan, her mother's boyfriend, had inappropriately touched her leg, and claimed that Jernigan was responsible for the accusations and an anonymous letter.[6] (Doc. 21-2 at 599–601, 721, 809, 894, 913, 984.)

The victim testified that she accused Jernigan of inappropriately touching her leg to protect Geer because she did not want destroy Geer's life. (Doc. 21-2 at 601.)

---

[6] The anonymous letter, addressed to the Florida Department of Law Enforcement commissioner, vaguely stated that the fire chief is "a pedophile [who] may have taken liberties with underaged children" and identified a person who may know about the sexual abuse. (Doc. 21-2 at 977–79, 1020, 1159.) An agent interviewed the person identified in the letter and learned about Geer, the victim, the victim's mother, and Jernigan. (Doc. 21-2 at 979–82, 1025.)

The victim became extremely upset when the agents told her that she must return to Georgia with her mother and Jernigan. (Doc. 21-2 at 602–03, 757–58, 896.) The victim believed her mother selfishly reported the sexual abuse to law enforcement because of contentious divorce proceedings between her mother and Geer and because Jernigan, who was a firefighter, wanted Geer's job as fire chief. (Doc. 21-2 at 603.)

The victim called Geer to inform him about her surprise meeting with the agents at the mall and reassured Geer that she denied that any sexual abuse occurred. (Doc. 21-2 at 606–07.) Geer told the victim that the agents interviewed him and that he also denied that any sexual abuse occurred. (Doc. 21-2 at 607–08.) Geer encouraged the victim to continue to deny that any sexual abuse occurred. (Doc. 21-2 at 608.) A few weeks later, the victim began to experience nightmares about Geer and decided that she wanted to truthfully disclose the sexual abuse to the agents. (Doc. 21-2 at 610–11, 760–62.)

A female agent spoke with the victim on the telephone, arranged to interview the victim in Georgia, and told the victim not to speak with Geer. (Doc. 21-2 at 614, 899.) In a journal, the victim wrote that she wanted both "justice" and compensation for college. (Doc. 21-2 at 615.) The victim met with the agent, told

the agent that she had lied during the earlier interview, and described the sexual
abuse by Geer. (Doc. 21-2 at 612–13, 618, 900–01.)

Before the meeting with the agent, the victim sent a text to Geer wishing him
a Happy Thanksgiving and met with Geer in Georgia to shop for clothes and school
supplies. (Doc. 21-2 at 616–17.) The victim did not tell Geer that she planned to
meet with the agent. (Doc. 21-2 at 617.)

The prosecutor played for the jury a recording of a telephone call arranged by
the agent between the victim and Geer. (Doc. 21-2 at 649, 902–04.) During the
telephone call, the victim asked Geer for closure. (Doc. 21-2 at 653–55, 657.) The
victim told Geer, "[B]ut I was only eight years old when it happened and, like, nine
years of my life just seems like so much." (Doc. 21-2 at 659.) Geer responded, "Well,
there really wasn't anything happening back then, very much." (Doc. 21-2 at 659.)
The victim told Geer, "I can't even like really live each day without thinking about
it . . . . [K]eeping a secret like that at eight years old and nine years old until you're
sixteen is one of the most difficult things to do." (Doc. 21-2 at 661.) Geer replied,
"Yeah, I'm sure. . . . I'm sorry if I ever put any pressure on you or made anything
difficult ever. I never meant to do that." (Doc. 21-2 at 661.)

Also, the victim asked, "I feel like I know that you knew better, and you knew that I didn't know better because I was only eight. And . . . I want to know why you just didn't listen to that instinct telling you that you knew better, . . . that this was not supposed to happened, because it wasn't." (Doc. 21-2 at 663.) Geer replied, "I'm not really sure what it was. It was just [ ] we were just good friends, and we were very close and [ ] you were very curious and [ ] I don't know. I just don't know why I [ ] didn't do something different." (Doc. 21-2 at 664.)

The victim stated, "I had sex with my stepdad, and it just seems, like, so unreal that that would happen to me, you know? . . . I don't know any other teenage girl who's been through that, and I don't have anybody to talk to about it, and it beats me up pretty badly." (Doc. 21-2 at 664.) Geer replied, "Sorry that it beats you up, but I never really knew that. . . . I'm really sorry . . . . I never meant for you to struggle." (Doc. 21-2 at 664–65.)

After the telephone call, Geer sent the victim $100.00 to help her purchase a car. (Doc. 21-2 at 642.) The victim hired an attorney to file a civil suit against Geer but dismissed the case because she later decided that she did not want any money. (Doc. 21-2 at 643–44.) The victim's mother encouraged the victim to earn money by appearing on a television program like 60 Minutes, but the victim declined. (Doc.

21-2 at 727.) The victim sought therapy on her own and wanted the conflict to end.
(Doc. 21-2 at 644–45.)

During the execution of a search warrant at Geer's home, the agents did not
find any evidence of the sexual abuse or child pornography. (Doc. 21-2 at 911–12,
935–37.)[7] Records obtained by the agents substantiated telephone calls between the
victim and Geer, purchases, including a purchase of lingerie, by Geer, and the trips
to the conventions. (Doc. 21-2 at 1007–15.)

During the defense case, Geer testified and denied that any sexual abuse
occurred. (Doc. 21-2 at 1091, 1131, 1141.) He testified that union members at the
fire department where he worked wanted to remove him from his position as fire
chief and that the victim and her mother wanted money from him. (Doc. 21-2 at
1057–65.) The City of Clearwater hired Geer as fire chief to resolve problems in the
fire department, and the changes that Geer implemented angered firefighters in the
union. (Doc. 21-2 at 1059–61, 1081–83.) Geer planned to terminate Jernigan

---

[7] Videotapes seized from Geer's home and car contained recordings of objects like a couch,
a door frame, and a wall, and static on a television. (Doc. 21-2 at 1004–06.) Also, a
videotape contained a short clip of an adult woman dressed in lingerie followed by a lengthy
recording of a construction site. (Doc. 21-2 at 1004, 1006–07, 1030–31.) In closing, the
prosecutor argued that Geer erased any earlier incriminating recording. (Doc. 21-2 at
1272.)

because of his poor work performance and misconduct. (Doc. 21-2 at 1059–60.)
After the victim's mother began to date Jernigan, she demanded a divorce from Geer
and threatened to retaliate against Geer by accusing him of sexual abuse if he
terminated Jernigan. (Doc. 21-2 at 1063–65.)

Geer testified that the victim had a terrible relationship with her mother, who
abused alcohol and drugs, and that, as a stepfather, he loved the victim. (Doc. 21-2
at 1099, 1104–05.) He admitted that he purchased items for the victim and traveled
with her to conventions. (Doc. 21-2 at 1074–75, 1099–1102.)[8] Geer purchased the
lingerie for an ex-girlfriend. (Doc. 21-2 at 1088–89.)

Geer testified that, before the recorded call, the victim sent him a text stating
that she needed to speak with him. (Doc. 21-2 at 1077.) Geer believed that the
victim was part of a "scam" with the victim's mother, Jernigan, and other firefighters
in the union and that he intended to record the call to "double-cross" the victim.
(Doc. 21-2 at 1077–80.) Geer testified that during the telephone call he did not

---

[8] Geer identified the woman dressed in lingerie depicted on the video recording as an ex-
girlfriend. (Doc. 21-2 at 1085.) The videotape also contained a recording of her daughter's
high school graduation. (Doc. 21-2 at 1084–85.) The other videotapes contained
recordings of objects because the victim frequently forgot to turn the video camera off after
using the camera. (Doc. 21-2 at 1086–87.)

argue with or confront the victim when she stated that she had sex with him because he had already denied the sexual abuse when he spoke with the agents and because both he and the victim knew that she was lying. (Doc. 21-2 at 1080–81, 1126–27, 1130.)

## II.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established

23

federal law is objectively unreasonable, and . . . an unreasonable application is
different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the
AEDPA, "a state prisoner must show that the state court's ruling on the claim being
presented in federal court was so lacking in justification that there was an error well
understood and comprehended in existing law beyond any possibility for fairminded
disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v.
Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of
clearly established federal law must be objectively unreasonable" for a federal habeas
petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a
reasoned opinion, a federal habeas court reviews the specific reasons as stated in the
opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*,
138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular
justifications the state court provided for its reasons, and [it] may consider additional
rationales that support the state court's determination." *Jennings v. Sec'y, Fla. Dep't
of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court
decision is not accompanied with reasons for the decision—such as a summary
affirmance without discussion—the federal court "should 'look through' the

unexplained decision to the last related state-court decision that does provide a

relevant rationale [and] presume that the unexplained decision adopted the same

reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by

showing that the unexplained affirmance relied or most likely did rely on different

grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds

reviewing the record might disagree about the finding in question.' " *Brown v.

Davenport*, 596 U.S. 118, 135 (2022) (quotations omitted). "An unreasonable

determination of the facts occurs when the direction of the evidence, viewed

cumulatively, was too powerful to conclude anything but the petitioner's factual

claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir.

2020) (internal quotation marks and alterations omitted). A state court's findings of

fact are presumed correct, and a petitioner can rebut the presumption of correctness

afforded to a state court's factual findings only by clear and convincing evidence. 28

U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show

that the state court's decision is "based on" the incorrect factual determination. *Pye

v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is

because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner

shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.   STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Geer brings claims for ineffective assistance of trial counsel. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed Geer must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes

deficient performance if "the identified acts or omissions [of counsel] were outside
the wide range of professionally competent assistance." *Id.* at 690. A court "must
judge the reasonableness of counsel's challenged conduct on the facts of the
particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly
presumed to have rendered adequate assistance and made all significant decisions in
the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced
the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable,
does not warrant setting aside the judgment of a criminal proceeding if the error had
no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must
show "a reasonable probability that, but for counsel's unprofessional errors, the result
of the proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is
not whether a federal court believes the state court's determination' under the
*Strickland* standard 'was incorrect but whether that determination was
unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S.
111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

IV. <u>ANALYSIS</u>

A. Ground One

Geer argues that trial counsel deficiently performed by not moving to suppress the recording of the telephone call between Geer and the victim. (Doc. 43 at 4–5.) He contends that agents who recorded the telephone call violated Georgia law by failing to obtain his consent before recording the call. (Doc. 43 at 5.)

Geer admits that postconviction counsel did not assert this claim in state court. (Doc. 43 at 5.) However, he asserts that *Martinez v. Ryan*, 566 U.S. 1 (2012), permits review of the procedurally defaulted claim. (Doc. 44 at 2–3.) *Martinez* requires a petitioner to demonstrate that postconviction counsel deficiently performed by not asserting the procedurally defaulted claim and that the procedurally defaulted claim has some merit. *Id.* at 14.

At trial, the victim testified that agents traveled to Georgia to interview her. (Doc. 21-2 at 611–13, 618.) After the interview, the agents recorded a telephone

29

call between the victim, who was seventeen, and Geer. (Doc. 21-2 at 903–04.) Geer

testified that, while at home in Florida, he attempted to record the telephone call,

but his recording device malfunctioned. (Doc. 21-2 at 1078–79.) After the

controlled telephone call, the agents left Georgia. (Doc. 21-2 at 641.)

After the postconviction court denied Geer's first motion for postconviction

relief, Geer moved to suppress the recording of the telephone call. (Doc. 21-3 at

399–414.) The postconviction court determined that, because Geer uttered the

recorded statements in Florida, Florida law applies. (Doc. 21-3 at 418.) The

postconviction court denied the motion because Florida law authorized the agents

to record the telephone call to obtain evidence of a criminal act. (Doc. 21-3 at 418.)

Whether Florida law or Georgia law applies to the interception of a

communication is an issue of state law, and a federal court defers to a state court's

determination of state law. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1295

(11th Cir. 2017) ("[A]lthough the issue of ineffective assistance—even when based

on the failure of counsel to raise a state law claim—is one of constitutional

dimension, we must defer to the state's construction of its own law when the validity

of the claim that [ ] counsel failed to raise turns on state law." (citation and internal

quotations omitted)).

30

Florida law prohibits the intentional interception of a wire, oral, or electronic communication. § 934.03(1)(a), Fla. Stat. "The actual 'interception' of a communication occurs not where such is ultimately heard or recorded but where the communication originates." *State v. Mozo*, 655 So. 2d 1115, 1117 (Fla. 1995). Because Geer uttered the recorded statements in Florida, § 934.03 applied.

Under § 934.03(2)(c), "[i]t is lawful [ ] for an investigative or law enforcement officer or a person acting under the direction of an investigative or law enforcement officer to intercept a wire, oral, or electronic communication when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act." Because the victim testified that she agreed to participate in the recorded telephone call and denied that the agents exerted pressure on her to participate, (Doc. 21-1 at 618–19), a motion to suppress the recording would not succeed. *Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

§ 16-11-66(b), Georgia Code, prohibits a law enforcement officer from intercepting a wire communication between a child under eighteen and another

person unless the officer obtains either an order by a judge authorizing the interception or consent from the child's parent or guardian. *See London v. State*, 775 S.E.2d 787, 790 (Ga. App. 2015). Even if the agents violated § 16-11-66(b) by intercepting Geer's communication, Georgia law permits suppression of a communication only in a court in Georgia. § 16-11-67, Ga. Code ("No evidence obtained in a manner which violates any of the provisions of this part shall be admissible in any court of this state except to prove violations of this part."). Because Georgia law does not authorize suppression of a communication in a court in Florida, and because Florida law permitted the interception, Geer's claim is meritless.

Lastly, Geer argues that the agents from Florida lacked jurisdiction to record the telephone call in Georgia. (Docs. 56 at 16 and 57 at 1–2.) However, "[l]aw enforcement officers may conduct a lawful investigation outside of their territorial jurisdiction if the subject matter of the investigation originated in their own jurisdiction." *State v. Stouffer*, 248 So. 3d 1165, 1168 (Fla. 4th DCA 2018). Because the victim testified that Geer sexually battered and molested her in Pinellas County, the agents from Florida had jurisdiction to travel to Georgia to investigate the sexual abuse.

Opinions cited by Geer do not support granting relief. (Doc. 56 at 11, 14–15.) In *Miller v. State*, 411 So. 2d 944, 945 (Fla. 4th DCA 1982), an informant, who was in California with a California police officer, recorded incriminating statements by the defendant, who was in Florida, during a telephone call. *Miller* declined to determine whether California law governed the interception of the communication and instead held that § 934.03(2)(c) authorized the interception. *Id.* at 946. In *State v. Stout*, 693 So. 2d 657, 657 (Fla. 4th DCA 1997), a victim of a sexual battery, who lived in Georgia, called the defendant, who lived in Florida. Because the victim consented to the recording of the telephone call by law enforcement in Georgia, *Stout* held that § 934.03(2)(c), authorized the interception. *Id.* at 658–59.

Also, in *Echols v. State*, 484 So. 2d 568, 571 (Fla. 1985), an informant surreptitiously recorded incriminating statements by the defendant in the defendant's home in Indiana without the assistance of law enforcement. *Echols*, 484 So. 2d at 571. The agents recorded the telephone call between Geer and the victim, after obtaining permission from the victim. Consequently, § 934.03(2)(c), authorized the agents' interception of the telephone conversation.

33

*State v. McCormick*, 719 So. 2d 1220, 1222 (Fla. 5th DCA 1998), held that a police officer in Melbourne, Florida, had jurisdiction to execute an order authorizing a wiretap of a telephone that belonged to a person who resided in Merritt Island, Florida. A wiretap did not record the telephone conversation between Geer and the victim. *See McCormick*, 719 So. 2d at 1222 ("We agree with the State that *Mozo* should be limited to its facts; the court was discussing the right to privacy rather than the issue of jurisdiction."). The agents from Florida had jurisdiction to travel to Georgia to investigate the sexual abuse that occurred in Florida. *Stouffer*, 248 So. 3d at 1168.

Because Geer's claim is meritless, Ground One is dismissed as procedurally barred. *Martinez*, 566 U.S. at 14.

## B. Ground Two

Geer argues that trial counsel deficiently performed by not objecting to opinion testimony by two agents about the credibility of the victim. (Doc. 43 at 6.)

At trial, Agent Edith Neal testified that she and Agent Ryan Bailey interviewed the victim at the mall. (Doc. 21-2 at 891–92.) Agent Neal testified that, during the interview, the victim appeared angry, blamed her mother, and stated that Jernigan inappropriately touched her, even though neither agent asked a question

34

about Jernigan. (Doc. 21-2 at 893–96.) Agent Neal testified that she did not allow

the victim, who was seventeen, to return to Geer's home and instead asked her

mother to drive the victim to Georgia to stay at her grandmother's home. (Doc.

21-2 at 895–96.) Agent Neal testified that, because she and Agent Bailey "felt after

the initial interview with [the victim] that [the victim] was not being truthful," the

agents obtained permission from the victim's mother to secretly record the

conversation between the victim, her mother, and Jernigan during the ride to

Georgia. (Doc. 21-2 at 894–95.)

Agent Bailey testified that the victim appeared upset, defensive, and angry at

her mother. (Doc. 21-2 at 984.) Agent Bailey testified that, after the interview, he

and Agent Neal "decided that there were things that [the victim] had told [them]

that [they] didn't think were true," and that "[the victim] wasn't being truthful with

[them] at that time." (Doc. 21-2 at 985.) Agent Bailey testified that, because of the

victim's untruthful statements, the agents secretly recorded the victim's statements

during the ride to Georgia. (Doc. 21-2 at 985.)

The postconviction court denied Geer's claim because trial counsel testified at

an evidentiary hearing that the agents' opinion testimony about the credibility of the

victim supported Geer's defense. (Doc. 70 at 14.) Trial counsel testified that the

testimony demonstrated that the agents "kind of picked and chose when to take [the victim's] statements as being truthful and when to take her statements as being fabricated." (Doc. 21-2 at 2137.) The postconviction court determined that trial counsel strategically chose not to object. (Doc. 70 at 14)

At trial, on cross-examination, the victim admitted that she initially fabricated the accusation that Jernigan inappropriately touched her because she wanted to divert the agents' attention away from Geer. (Doc. 21-2 at 722–23.) Agent Bailey admitted that, after the victim told him about the inappropriate touching by Jernigan, he permitted the victim to travel in a car with Jernigan and her mother. (Doc. 21-2 at 916–18.) During closing, trial counsel argued that the victim contradicted herself by denying that Geer abused her during the first interview and by accusing Geer of sexually abusing her during the second interview. (Doc. 21-2 at 1235–39.) Trial counsel emphasized that the agents arrested Geer and believed that he was guilty, even though the victim contradicted herself about the sexual abuse. (Doc. 21-2 at 1214–15.)

Because the record demonstrates that trial counsel exploited the victim's contradictory statements to the agents, (Doc. 70 at 14), Geer fails to demonstrate that "no competent counsel would have taken the action that [trial] counsel did

take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). *Blackmon v. Sec'y, Dep't Corrs.*, 34 F.4th 1014, 1027 (11th Cir. 2022) ("The Supreme Court made clear in *Strickland* that 'a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " (quoting *Strickland*, 466 U.S. at 689)).

Also, the postconviction court denied the claim because Geer failed to demonstrate prejudice under *Strickland*. (Doc. 70 at 14–15.) During the controlled call, Geer apologized three times to the victim, after the victim asked Geer for "closure," reassured Geer that it was "safe to talk," told Geer that she struggled to understand why she had to keep a secret since she was eight or nine, and expressed to Geer that she felt ashamed and different from other teenage girls knowing that she had sex with him. (Doc. 21-2 at 653–66.) The postconviction court concluded that, because of Geer's incriminating admission during the controlled call, Geer failed to demonstrate a reasonable probability that the outcome at trial would change if trial counsel objected to the agents' testimony about the victim's credibility. (Doc. 70 at 15.)

During closing, the prosecutor argued that Geer's apology appeared genuine and demonstrated that he committed the crimes. (Doc. 21-2 at 1258–59, 1274.) Geer's apology qualified as a statement from which the jury could infer his guilt. *Perera v. State*, 873 So. 2d 389, 392 (Fla. 3d DCA 2004) (citing *Pieczynski v. State*, 516 So. 2d 1048, 1051 (Fla. 3d DCA 1987)). Also, Geer's failure during the controlled call to deny that he sexually abused the victim critically impeached his exculpatory testimony at trial. *Hawn v. State*, 300 So. 3d 238, 242 (Fla. 4th DCA 2020) ("'[A]n omission in a previous out-of-court statement about which the witness testifies at trial' can be considered an inconsistent statement for impeachment purposes, if the omission is a 'material, significant fact rather than mere details and would naturally have been mentioned.' " (quoting *Varas v. State*, 815 So. 2d 637, 640 (Fla. 3d DCA 2001)). *See Nelson v. State*, 748 So. 2d 237, 242 (Fla. 1999) ("If a party is silent, when he ought to have denied a statement that was made in his presence and that he was aware of, a presumption of acquiescence arises.").

Because Geer failed to demonstrate a reasonable probability that the outcome at trial would change if trial counsel objected to the testimony by the agents about the victim's credibility, the postconviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on

the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). Ground Two does not warrant relief.

## C. Ground Three

Geer argues that trial counsel deficiently performed by not introducing into evidence text messages between Geer and the victim, an audio recording that contains statements by the victim, and Tumblr postings that contain statements by the victim. (Doc. 43 at 7.) Geer contends that trial counsel should have impeached the victim with the evidence. (Doc. 43 at 7.)

### Text Messages

Geer argues that trial counsel deficiently performed by not introducing into evidence text messages by the victim. (Doc. 43 at 7.) In his amended motion for postconviction relief, Geer described the content of the text messages. (Doc. 21-2 at 1654–57.)

In a text message sent by the victim to Geer two days after the victim arrived at her grandmother's home in Georgia, the victim told Geer that the police "can fuck off and burn in hell with my psycho mother and her annoying stupid fuck boyfriend." (Doc. 21-2 at 1654.) Also, the victim told Geer that "the police had permitted her

to be locked inside of a car with [Jernigan] using a 'child-proof lock on the backseat' [ ] after she had just told the police that [Jernigan] had previously touched her inappropriately in a sexual manner." (Doc. 21-2 at 1654–55.)

The victim stated that "the actions of the police in permitting her to be in the car with [Jernigan] after she told them about him inappropriately touching her could justify a lawsuit against the police." (Doc. 21-2 at 1655.) After Geer promised to speak with an attorney about the police officers' conduct, the victim replied asking Geer to inform the attorneys that "[she is] being held hostage in the middle of nowhere." (Doc. 21-2 at 1655.)

In another text message that the victim sent just before Thanksgiving, the victim told Geer that she did not have "any shoes or clothes to wear or school supplies or backpack." (Doc. 21-2 at 1656.) Geer suggested that the victim's mother or Jernigan could purchase the items for her, and the victim replied that her mother and Jernigan would never buy the items for her. (Doc. 21-2 at 1656.) In another text, the victim wished Geer a Happy Thanksgiving, and Geer informed the victim that he arrived at his son's home in Georgia. (Doc. 21-2 at 1656.) The victim replied that she wanted to meet Geer the day after Thanksgiving, when they went shopping. (Doc. 21-2 at 1656–57.)

40

The postconviction court denied the claim because the content of the text messages is cumulative to other evidence admitted at trial. (Doc. 69 at 11–12.) At trial, the victim testified that she never liked Jernigan because he caused problems between her and her mother. (Doc. 21-2 at 574–75.) The victim testified that she frequently fought with her mother. (Doc. 21-2 at 583–84, 588.) The victim testified that, during the divorce between her mother and Geer, she frequently spoke with Geer about her hatred for her mother and Jernigan. (Doc. 21-2 at 586, 709.)

The victim testified that, when she discovered that her mother had arranged the meeting with the agents at the mall, she felt "pretty pissed off" at her mother. (Doc. 21-2 at 599.) The victim testified that she told the agents that Jernigan had inappropriately touched her leg and was "behind all of this." (Doc. 21-2 at 600.) The victim testified that she became "extremely upset" when the agents informed her that she could not return to Geer's home and that her mother and Jernigan would drive her to stay with her grandmother in Georgia. (Doc. 21-2 at 602.) The victim testified that during the ride to her grandmother's home she yelled at her mother and accused her mother of disclosing the sexual abuse to law enforcement for selfish reasons. (Doc. 21-2 at 603–04.)

The victim testified that she called Geer and told him about the meeting at the mall with the agents. (Doc. 21-2 at 606.) She told Geer that she denied that sexual abuse occurred. (Doc. 21-2 at 608–09.) She testified that she decided to truthfully speak with the agents after experiencing nightmares about Geer and after speaking with her grandmother. (Doc. 21-2 at 610–11.) She testified that the agents planned to travel to Georgia to interview her right after Thanksgiving and told her not to speak with Geer. (Doc. 21-2 at 614.)

The victim testified that, after the agents told her not to speak with Geer, she sent a text message to Geer wishing him a Happy Thanksgiving. (Doc. 21-2 at 616.) She testified that she also met with Geer at the mall to shop for clothes and school supplies. (Doc. 21-2 at 616–17.)

At trial, the jury learned about both the victim's hatred for her mother and Jernigan and the victim's accusation against Jernigan. The jury learned that the agents placed the victim in the car with Jernigan after she accused Jernigan of inappropriately touching her. Also, the jury learned that the victim sent text messages to Geer and went shopping with him after she disclosed the sexual abuse to the agents and after the agents told her not to speak with him.

42

Because the content of the text messages is cumulative to the victim's
testimony at trial, Geer failed to demonstrate prejudice under *Strickland*.
Consequently, the postconviction court did not unreasonably deny the claim.
*Guardado v. Sec'y, Fla. Dep't Corrs.*, 112 F.4th 958, 984 (11th Cir. 2024)
("[N]o prejudice can result from the exclusion of cumulative evidence. [E]vidence
presented in postconviction proceedings is cumulative or largely cumulative to . . .
that presented at trial when it tells a more detailed version of the same story . . . [,]
provides more or better examples[,] or amplifies the themes presented to the jury."
(citations and internal quotations omitted)).

## Audio Recording

Geer argues that trial counsel deficiently performed by not introducing into
evidence an audio recording that contained statements by the victim. (Doc. 43 at 7.)
In his amended motion for postconviction relief, Geer described the recording.
(Doc. 21-2 at 1657–58.)

After the meeting with the agents at the mall, the victim's mother and
Jernigan drove the victim to stay with her grandmother in Georgia. (Doc. 21-2 at
1658.) With permission from the victim's mother, the agents recorded the
conversation between the victim, her mother, and Jernigan during the ride. (Doc.

21-2 at 1658.) During the recording, the victim told her mother and Jernigan that she told the agents that Jernigan had inappropriately touched her. (Doc. 21-2 at 1658.) Geer contended that the victim spoke about the accusation "in a way that made it clear that this act [by Jernigan] was real and had previously been discussed among them." (Doc. 21-2 at 1658.)

The postconviction court denied the claim because Geer did not demonstrate prejudice under *Strickland*. (Doc. 69 at 12–14.) At trial, the jury learned that the victim became extremely angry about the surprise meeting with the agents at the mall and about the car ride to her grandmother's home in Georgia. (Doc. 21-2 at 599, 602.) During the ride, she yelled at her mother and accused her mother of disclosing the sexual abuse to law enforcement for selfish reasons. (Doc. 21-2 at 603–04.) The victim testified that she accused Jernigan of inappropriately touching her to draw the agents' attention away from Geer. (Doc. 21-2 at 600–01.) The victim did not want to ruin Geer's life because he had always cared for her and because she considered him her father. (Doc. 21-2 at 601.) The victim later decided to truthfully speak with the agents after experiencing nightmares about Geer and after speaking with her grandmother. (Doc. 21-2 at 610–11.) Agent Neal testified that the victim did not use the word "molestation," when describing the inappropriate act by

44

Jernigan. (Doc. 21-2 at 894.) Agent Neal further testified that the victim accused Jernigan of inappropriately touching her, even though neither she nor Agent Bailey asked the victim about Jernigan. (Doc. 21-2 at 892–94.)

Because the jury learned about the victim's accusation against Jernigan and because testimony at trial undermined the credibility of the accusation, Geer failed to demonstrate prejudice under *Strickland*. Consequently, the postconviction court did not unreasonably deny the claim. *Aldrich v. Wainwright*, 777 F.2d 630, 637 (11th Cir. 1985) ("Aldrich has not identified any specific information that would have been revealed by depositions or interrogatories and would have added to the impeachment of the State's witnesses. . . . Given [the] substantial impeachment of the testimony and credibility of Strickland, who furnished the only direct evidence that Aldrich committed the murder, the collateral matters Aldrich now asserts should have been explored do not create a reasonable probability that the jury would have given less credence to Strickland's testimony.").

### Tumblr Postings

Geer argues that trial counsel deficiently performed by not introducing into evidence Tumblr postings that contain statements by the victim. (Doc. 43 at 7.)

In his amended motion for postconviction relief, Geer described the postings. (Doc.
21-2 at 1657–58.)

Four days after her arrival to Georgia, the victim posted on Tumblr that she
desperately wanted to return to Florida where her family and friends lived, she felt
miserable in Georgia, she suffered from depression and suicidal thoughts, and she
wanted to run away. (Doc. 21-2 at 1659.) Another user accused the victim of
"whining" and suggested that "maybe [she] should just end [her] life the right way
this time." (Doc. 21-2 at 1659.) The victim replied that "[her] family [was] falling
apart at the seams," and that she has "so much legal shit on the line and everything
[she] say[s] differs from either putting [her] dad in jail or having [her] mom hate
[her] forever." (Doc. 21-2 at 1659.) She stated that she took care of her disabled
sister and her baby, who was one, without any financial help from the baby's father.
(Doc. 21-2 at 1659.) She denied that she suffered from suicidal thoughts because
she missed her family and instead stated that she "dislik[ed] the majority of [her]
family." (Doc. 21-2 at 1659.)

The postconviction court denied the claim because trial counsel reasonably
chose not to introduce into evidence the social media postings. (Doc. 70 at 8–9.) At
an evidentiary hearing, trial counsel testified that he discovered other postings by the

victim that incriminated Geer. (Doc. 21-2 at 2133–34.) In one posting, the victim stated, (Doc. 21-2 at 2135):  "I wish I didn't have to go through with this, but [ ] it basically suggests that I was the victim of sexual abuse when I was young, and I wish almost like either I could take my life or I could take it back, but if I take it back[,] it could happen to somebody else. At least now I know it won't happen to another girl, another time." In another posting, the victim stated that she was "f'd up" because of what Geer "had done to her all those years." (Doc. 21-2 at 2136.) Trial counsel believed that the prosecutor did not know about the victim's Tumblr account. (Doc. 21-2 at 2134.)

Also, at the evidentiary hearing, the victim testified about other Tumblr postings. In one posting, the victim wrote, "Bloody hell, this is eating me alive," next to a picture that said, "You fucked me up." (Doc. 21-2 at 2115.) The victim added, "This is how I feel right now. Thanks, Chief," referring to Geer, who was a fire chief. (Doc. 21-2 at 2116.) In another posting, the victim stated that watching a news story about Geer's criminal case makes her cry, "die a little inside," and "feel like in some way [she's] not even here anymore." (Doc. 21-2 at 2117.) She described herself as "barely existing" and suggested that "[m]aybe [she] should end it now." (Doc. 21-2 at 2117.) In a third posting, the victim stated, "I want to scream that I lied and get

him off the hook. I want to tell everyone that it was all just a sick joke. God, I wish
I could say that." (Doc. 21-2 at 2119.) The victim added, "What's done is done. And
he'll never harm another girl in his life." (Doc. 21-2 at 2119.)

Trial counsel reasonably chose not to introduce into evidence the posting by
the victim about "either putting [her] dad in jail or having [her] mom hate [her]
forever," to avoid the discovery and the admission of these other highly incriminating
postings by the victim. Because Geer failed to demonstrate that "no competent
counsel would have taken the action that [trial] counsel did take," the postconviction
court did not unreasonably deny the claim. *Chandler*, 218 F.3d at 1315.

In a memorandum supporting his second amended petition, Geer contends
that after the evidentiary hearing he discovered evidence that demonstrates that trial
counsel falsely testified that the prosecutor did not know about the victim's Tumblr
account. (Doc. 44 at 11.) Geer contends that he discovered a report by a FDLE
forensic analyst that shows that fifteen months before trial the analyst discovered
1251 pages of Tumblr posts on the victim's laptop. (Doc. 44 at 11.) Also, he
discovered that during a deposition before trial a witness testified about the social
media postings. (Doc. 44 at 11.) He contends that both the FDLE report and the

deposition transcript demonstrate that trial counsel falsely testified, and that the prosecutor knew that trial counsel's testimony was false. (Doc. 44 at 11.)

Because "an alleged defect in a collateral proceeding does not state a basis for habeas relief," Geer's claim based on the presentation of fraudulent testimony at the evidentiary hearing is meritless. *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004). Also, "review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). *See Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("*Pinholster*'s holding governs only claims brought under Section 2254(d)(1), but its logic applies even more clearly to Section 2254(d)(2) . . . .").

Geer did not support his first postconviction motion with any of the evidence that allegedly demonstrates that trial counsel fraudulently testified at the evidentiary hearing. Geer instead attempted to supplement the record by presenting that evidence for the first time in an appendix attached to his initial brief on postconviction appeal. (Doc. 21-3 at 61–222.) In the answer brief, the State of Florida argued that the documents in Geer's appendix were not part of the record on appeal. (Doc. 21-3 at 232.) Because the record on postconviction appeal excludes

49

documents not presented to the postconviction court, *Pinholster* bars consideration of those documents on federal habeas. 563 U.S. at 181; *see* Fla. R. App. P. 9.141(b)(3)(B)(i) (identifying as part of the record on appeal "the notice of appeal, motion, response, reply, order on the motion, motion for rehearing, response, reply, order on the motion for rehearing, and attachments to any of the foregoing, as well as the transcript of the evidentiary hearing").

To fairly present the claim in state court, Geer must file a new motion for postconviction relief that raises an ineffective assistance of counsel claim based on new evidence. 28 U.S.C. § 2254(b). In a second postconviction motion, Geer instead asserted that trial counsel's allegedly fraudulent testimony deprived him of due process at the evidentiary hearing. (Doc. 21-3 at 792–816.) In his brief on appeal, Geer also presented a due process claim based on fraud. (Doc. 21-3 at 874–902.) If Geer returned to state court to raise an ineffective assistance of counsel claim based on new evidence, the postconviction court would dismiss the claim as untimely. Fla. R. Crim. P. 3.850(b). Consequently, an ineffective assistance of counsel claim based on new evidence is procedurally defaulted in federal court. *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998).

Geer contends that he discovered that during a deposition before trial a witness testified about the social media postings. (Doc. 44 at 11.) In the deposition transcript attached to Geer's initial brief, the father of the victim's boyfriend testified that he began to monitor MySpace and Facebook accounts that belonged to the victim. (Doc. 21-3 at 88.) After the victim and her boyfriend separated, the father of the victim's boyfriend anticipated that the victim's postings on MySpace and Facebook would become relevant in a court proceeding that determined custody over the baby. (Doc. 21-3 at 88.) The father of the victim's boyfriend testified that he printed the postings and placed them in a folder. (Doc. 21-3 at 88–89.) However, the father of the victim's boyfriend did not refer to any Tumblr account that belonged to the victim.

Geer contends that, fifteen months before trial, a FDLE forensic analyst discovered 1251 pages of Tumblr posts on the victim's laptop. (Doc. 44 at 11.) In a response to a public records request, FDLE provided Geer a CD that contained an internet history report on the victim's laptop. (Doc. 21-3 at 115–20, 122–28.) Geer discovered some of the victim's postings on Tumblr in the internet history report. (Doc. 21-3 at 116–20.) Even if FDLE possessed an internet history report that

contained the Tumblr postings, Geer failed to demonstrate that, before trial, the prosecutor actually knew about the postings contained in the report.

Lastly, when denying the second postconviction motion, the postconviction court determined that, even if trial counsel falsely testified at the evidentiary hearing, Geer is not entitled to relief. (Doc. 21-3 at 831.) At the evidentiary hearing, the victim explained her posting on Tumblr about "either putting [her] dad in jail or having [her] mom hate [her] forever." (Doc. 21-2 at 2097–98.) She explained that she "was struggling between deciding who [she] needed a relationship with more." (Doc. 21-2 at 2097.) She believed that Geer was like her father, and she struggled to maintain a relationship with her mother. (Doc. 21-2 at 2097.) She meant to convey in the posting that she could either incarcerate her father by telling the truth or prevent his incarceration by "sticking to [her] first statement to FDLE [and] telling them [that] [she] had no idea what [they're] talking about." (Doc. 21-2 at 2097.) She testified that her mother wanted her to tell the truth. (Doc. 21-2 at 2098.)

If trial counsel introduced into evidence at trial the Tumblr posting, the victim would explain that the Tumblr posting did not exculpate Geer. (Doc. 21-3 at 831.) Because Geer cannot demonstrate a reasonable probability that the outcome at trial would change, the postconviction court did not unreasonably determine that Geer

is not entitled to relief. *Strickland*, 466 U.S. at 694. *Aldrich*, 777 F.2d at 637. Ground Three warrants no relief.

### D. Ground Four

Geer argues that trial counsel deficiently performed by not calling six witnesses to testify at trial. (Doc. 43 at 8–9.) In his amended postconviction motion, Geer identified the witnesses as Stan Loveday, Steven Strong, Jean Pierre Medani, David Lock, Tony Holloway, and Joe Roseto. (Doc. 21-2 at 1661–65.)

### Stan Loveday, Steven Strong, Tony Holloway, and Joe Roseto

Geer argues that trial counsel deficiently performed by not calling Loveday, Strong, Holloway, and Roseto to testify at trial. (Docs. 21-2 at 1661–64 and 43 at 8–9.) In his amended postconviction motion, Geer contended that Loveday, a logistics manager at the fire department where Geer was fire chief, and Strong, the fire marshal, would testify that they overheard Jernigan, a paramedic and the boyfriend of the victim's mother, state that "he was going to ruin [ ] Geer's life at any cost and was going to start by getting his wife." (Doc. 21-2 at 1661–62.)

Geer contended that Holloway, the chief of the Clearwater Police Department, would testify that, four or five days after the agents interviewed Geer, Holloway informed Geer that an FDLE official told him that "the investigation was almost over and, at that point, the allegations against [ ] Geer were considered to be unfounded." (Doc. 21-2 at 1663.)

Geer contended that Roseto, a human resources director at the City of Clearwater, and Holloway would testify that they learned from another FDLE official that the agents considered arresting Jernigan and the victim's mother for falsely reporting that Geer sexually abused the victim. (Doc. 21-2 at 1663–64.)

The postconviction court denied the claims because the proposed testimony by the witnesses is inadmissible hearsay. (Docs. 68 at 9–10 & 69 at 19–20.) Whether the proposed testimony is admissible at trial is an issue of state law, and a federal court defers to a state court's determination of state law. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure."). Because trial counsel could not present the proposed testimony at trial, the postconviction court did not unreasonably deny the claims. *Pinkney*, 876 F.3d at 1297.

### Jean Pierre Medani and David Lock

Geer argued that trial counsel deficiently performed by not calling Medani and Lock to testify at trial. (Docs. 21-2 at 1662–63 & 43 at 8–9.)

At the postconviction evidentiary hearing, Medani testified that he worked as the assistant chief in charge of Emergency Medical Services in the City of Clearwater and that Geer asked him to investigate the unlawful diversion of narcotics at the fire department. (Doc. 21-2 at 2050–51, 2061.) He testified that his investigation targeted a shift that Jernigan supervised. (Doc. 21-2 at 2051.) He testified that, during the investigation, he discovered a syringe filled with a mix of clear liquid and blood in Jernigan's desk. (Doc. 21-2 at 2051–52, 2061.) He testified that he placed the syringe in a bag, gave the syringe to Lock, and notified his supervisor and Geer about the possible violation of the City's drug and alcohol policy. (Doc. 21-2 at 2052, 2061, 2071.) He testified that he investigated Jernigan for mishandling other narcotics and "counseled" Jernigan about mishandling of narcotics many times. (Doc. 21-2 at 2053, 2066.) He testified that, even though the City Manager at the City of Clearwater forbade him from contacting Geer about the criminal case, he would have testified at trial if subpoenaed. (Doc. 21-2 at 2054–55.) Medani testified

that Jernigan said that "he would do or say anything necessary to ensure [ ] Geer's removal." (Doc. 21-2 at 2056.)

Lock testified that he worked as a quality assurance director for the Office of the Medical Director of Pinellas County. (Doc. 21-2 at 2077–78.) He testified that Medani informed him about the investigation of mishandling narcotics at the Clearwater Fire Department and identified Jernigan as a suspect. (Doc. 21-2 at 2079.) He testified that he received the bag that contained the syringe found in Jernigan's desk and notified his director, the Clearwater Police Department, and the Drug Enforcement Administration. (Doc. 21-2 at 2080.) He did not remember whether the liquid in the syringe was tested. (Doc. 21-2 at 2080.) He testified that extended delays occurred when Jernigan delivered narcotics to a fire station. (Doc. 21-2 at 2081–82.) He testified that he audited all logs for the transfer of narcotics, recommended changes to policies governing the transfer, the storage, and the replacement of narcotics, and notified Geer about the results of the investigation. (Doc. 21-2 at 2082, 2089.) He testified that, even though his supervisors forbade him from speaking with anyone about the investigation, he would have testified at trial if subpoenaed. (Doc. 21-2 at 2089.)

The postconviction court denied the claims because Geer failed to demonstrate prejudice under *Strickland*. (Doc. 70 at 12–13.) The postconviction court described as "ridiculous" the argument that "the victim made up and pursued false allegations all the way through trial in order to support [ ] Jernigan's efforts to have [Geer] removed as fire chief." (Doc. 70 at 12.) At trial, the victim testified that she disliked Jernigan because he caused problems between her and her mother. (Doc. 21-2 at 574–75, 703.) The victim initially told the agents that Jernigan had inappropriately touched her leg and was "behind all of this." (Doc. 21-2 at 600, 721–23.) The victim believed that her mother reported the sexual abuse to law enforcement for selfish reasons. (Doc. 21-2 at 603.) The victim believed that her mother felt that she did not receive what she deserved from Geer in the divorce proceedings and that Jernigan wanted Geer's job as fire chief. (Doc. 21-2 at 603–04, 710–12.) Even if Medani's and Lock's proposed testimony demonstrated a motive for Jernigan and the victim's mother to accuse Geer of the sexual abuse, the proposed testimony did not undermine or impeach the victim's testimony. (Doc. 70 at 12.)

Also, during the controlled call, Geer apologized three times to the victim, after the victim asked Geer for "closure," reassured Geer that it was "safe to talk," told Geer that she struggled to understand why she had to keep a secret since she

was eight or nine, and expressed to Geer that she felt ashamed and different from

other teenage girls knowing that she had sex with him. (Doc. 21-2 at 654–64.)

Because the proposed testimony would not rebut Geer's highly incriminating

admission during the controlled call, the postconviction court did not unreasonably

deny the claims. (Doc. 70 at 13.) *Strickland*, 466 U.S. at 694. Ground Four warrants

no relief.

### E. Ground Five

Geer seeks relief based on the cumulative effect of the errors alleged in his

petition. The postconviction court denied the claim after determining that Geer's

other claims lacked merit. (Doc. 70 at 15.) A cumulative error claim must fail when

none of the "individual claims of error or prejudice have any merit." *Morris v. Sec'y,*

*Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because Geer has not shown

that any individual claim of error is meritorious, Ground Five does not warrant relief.

## V.   <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to

appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a

district court or court of appeals must first issue a certificate of appealability (COA).

*Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of

the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Geer must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Geer has not made the requisite showing. Finally, because Geer is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Geer's Second Amended Petition for Writ of Habeas Corpus, (Doc. 43), is **DENIED**. Because the record refutes Geer's claims, the motion, (Doc. 74), for an evidentiary hearing is **DENIED**. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). The **CLERK** is directed to enter judgment against Geer and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on September 4, 2025.

*Kathryn Kimball Mizelle*

Kathryn Kimball Mizelle
United States District Judge